IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 14, 2015 Session

## TIMOTHY EUGENE KELLY v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2010-B-1511     Steve R. Dozier, Judge**

_____

**No. M2014-01666-CCA-R3-PC – Filed October 8, 2015**

_____

The petitioner, Timothy Eugene Kelly, appeals the denial of his petition for post-conviction relief, arguing that he received the ineffective assistance of counsel. Based upon our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

Jessica Van Dyke, Nashville, Tennessee, for the appellant, Timothy Eugene Kelly.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Victor S. Johnson, III, District Attorney General; and J. Wesley King, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The petitioner was convicted of one count of especially aggravated robbery and two counts of fraudulent use of a credit card and sentenced to an effective sentence of thirty-seven years. His convictions and sentence were affirmed by this court on direct appeal, and our supreme court denied his application for permission to appeal. State v. Timothy Eugene Kelly, Jr., No. M2011-01260-CCA-R3-CD, 2012 WL 5193401, at *1 (Tenn. Crim. App. Oct. 22, 2012), perm. app. denied (Tenn. Jan. 14, 2013).

The underlying facts were recited by this court on direct appeal as follows:

At trial, the victim, Barbara Erskine Futter, testified that around 6:00 p.m. on October 27, 2009, she and her boyfriend, Claude Todd, had dinner with friends, one of whom was Diane Gregory, at the Calypso Café. Around 7:15 or 7:30 p.m., the victim and Todd went to a Target store on White Bridge Road. Approximately fifteen minutes later, after making purchases, they left the store. In the parking lot, they encountered Gregory, and the trio stopped to talk.

While they were talking, the victim heard a noise and looked over her left shoulder. The victim was then hit in the back, and she felt her purse being pulled from her shoulder. However, the victim was unable to see the perpetrator. Gregory ran into the store to report the incident, and Todd ran after the perpetrator.

The victim said that she stood in place, holding onto her shopping cart until Todd and Gregory returned. The victim said that she felt as if someone had hit her with a fist on her back and that she experienced a dull pain in her back. The police arrived and spoke with the victim, Todd, and Gregory. After ten or fifteen minutes, the victim needed to go inside and sit. The victim testified that she could not stand and had to hold onto a wall to walk inside the store.

As they walked down a hallway inside Target, Gregory told the victim that she saw a slit in the victim's raincoat. When they got to a room where the victim could sit, the victim pulled off her raincoat and the jacket she wore underneath. The victim's back was covered with blood, and she realized she had been wounded. A few minutes later, someone tried to push towels against her back, but the victim asked the person to stop because it was painful. Thereafter, ambulance personnel arrived and put the victim on a stretcher; the victim was unable to assist because "the pain in [her] back was so significant [she] couldn't really lean or bend or anything." The medical personnel placed the victim in an ambulance and transported her to Saint Thomas Hospital.

At the hospital, the victim was placed in a room, and a doctor told her that she had been stabbed. The victim said that the doctor's examination of the wound was "agony." The doctor determined that the wound was eight inches deep. Further testing revealed that one of the victim's kidneys had been lacerated. The victim stayed in the hospital for three days for treatment. She said that she still had a scar on the left side of her back.

The day after she was admitted to the hospital, the victim called her credit card company, informed them of the robbery, and cancelled her credit cards. A credit card company employee told her that her card had been used four times the day after her purse was stolen: once at an Exxon gas station, twice at a Fancy Nails salon, and once at a Krystal's restaurant. Additionally, on the night of the stabbing, there was an attempted use of her credit card on John E. Merritt Boulevard.

On cross-examination, the victim denied that she had suffered a "substantial risk of death." She stated that although her kidney function was "fine" at the time of trial, her kidney did not work correctly "right away" after the stabbing. The victim described the initial pain as "a thick, heavy pain like somebody had hit you with a fist." She stated that she was unable to walk without support.

Diane Gregory testified that while she was talking with the victim and Todd in the Target parking lot, she saw a man walking from the shopping cart area. The man was wearing blue jeans, and he had a blue bandana around his face, covering his nose and mouth. Gregory said that she saw the man's face from about three feet away. The man walked behind the victim, hit her, and took her purse. When the man fled, Gregory ran into Target to get help. Thereafter, the police arrived, and everyone moved inside the store. At that time, Gregory saw that the victim's jacket was ripped and that she had been stabbed.

Gregory stated that sometime later, police brought her a photograph lineup to examine. After looking at the photographs, she identified the [petitioner] as the perpetrator. On cross-examination, Gregory acknowledged that she had seen the [petitioner's] eyes but no other distinguishing features. Nevertheless, she was able to quickly identify the [petitioner] as the perpetrator.

Claude Todd testified that as he and the victim talked with Gregory in the Target parking lot, he saw a man quickly walking toward them from a service alley. The man had a bandana over his nose and mouth and a metallic object, which Todd thought was a pistol, in his hand. Todd believed the man was going to rob Target. However, the man moved behind the victim, and Todd heard the victim scream, "[W]hy did you hit me, or, you know, that's my purse." As the man left, Todd started to follow but slipped in a puddle of water.

3

After regaining his balance, Todd chased the perpetrator and saw him go into an alley behind either Dault's Restaurant or Calhoun's restaurant. The man got into a car that looked like a black Mustang or Trans Am, and the car sped away. Todd did not see enough of the man to be able to positively identify him; however, Todd knew the man was a black male with a slender build and height similar to Todd. Todd thought the man was a Target employee because he was wearing a red shirt. After the car left, Todd called 911 and returned to the victim.

When police arrived and the group went into Target, Todd had to assist the victim because she was weak. Gregory saw a tear in the back of the victim's coat. Todd pushed up the coat and saw that the victim's blouse was covered with blood. He also saw a cut in the victim's skin.

On cross-examination, Todd said that although he had watched the perpetrator, he was unable to identify him. Todd explained, "I got a good look at his eyes, but I was also not trying to stare at anybody that I perceived to have a gun at that time." He also explained that he thought the object the perpetrator carried was a gun because he did not think someone would try to rob Target with a knife.

Sharhonda Cunningham testified that she knew the [petitioner] but that she had not known him long at the time of the offenses. Cunningham acknowledged that she had previously been convicted of misdemeanor theft, but she denied that she had three other theft convictions.

Cunningham testified that on Sunday, October 25, 2009, she was a passenger in a black Mustang with the [petitioner] and four women: Shawndraka, Alicia, Jasmine, and Ashley. The Mustang belonged to Shawndraka. Cunningham did not know the surnames of any of the females. Two days later, Cunningham saw Shawndraka's car on television news footage regarding a robbery at Target.

Cunningham said that sometime after the robbery, she spoke with the [petitioner] on the telephone. The [petitioner] told her that he had robbed and stabbed a woman at Target. Cunningham said that she was not with the [petitioner] at Target.

On cross-examination, Cunningham stated that she did not know why the [petitioner] told her about the robbery. She denied that she was

4

familiar with the Crime Stoppers Program or that she was expecting money from the State for her testimony.

Shawndraka Goodner testified that on Sunday, October 25, 2009, she was in her dark blue Mustang with the [petitioner], Cunningham, Ashley, and Jasmine. Goodner did not know the last names of Ashley or Jasmine. Goodner said that Jasmine and the [petitioner] were "together." Goodner said that on October 27, she loaned her car to Jasmine. Later that night, Goodner saw her car on a television news report regarding a robbery at Target. When Goodner spoke face-to-face with the [petitioner], he said that he had committed a robbery at Target.

Goodner said that on October 28, she, her mother, and Jasmine went to Fancy Nails and had their nails done. Goodner and Jasmine paid with a credit card. On cross examination, Goodner acknowledged that she knew the card was stolen. She conceded that she initially told police she paid for the nail service with her own money.

Metropolitan Nashville Police Detective Robert Peterson said that at around 8:05 p.m. on October 27, 2009, he responded to a robbery at Target. After speaking with the victim for a while, Detective Peterson noticed that she had been stabbed. An ambulance was called, and the victim was transported to the hospital.

Detective Peterson stated that he obtained security camera footage from Target. On the video was a dark blue Mustang. Detective Peterson released a description of the vehicle to the news outlets. He then went to the hospital, spoke with the victim, and asked her to cancel her stolen credit cards. The victim did so, and Detective Peterson learned that there were unauthorized transactions on the card following the robbery. The transactions included an attempted charge at 2801 John E. Merritt Boulevard, two charges at Fancy Nails, and one charge at a Krystal's restaurant. Police were unable to obtain security video relating to the transactions. Another unauthorized charge occurred at an Exxon gas station. Detective Peterson obtained video footage that showed a black female paying for gas for a dark blue Mustang.

Detective Peterson said that on October 28, police dispatch notified him that Cunningham wanted to talk to him about the robbery at Target. When Detective Peterson interviewed Cunningham, she said that "[s]he had been riding around with [the petitioner]." After the interview, Detective

5

Peterson prepared a photograph lineup and showed it to Gregory, who was facing the perpetrator as he approached the victim. Gregory identified the [petitioner] from the lineup.

Thereafter, Detective Peterson spoke with Goodner, who acknowledged owning a 2000 model dark blue Ford Mustang. Goodner said that on October 27, she loaned the car to Jasmine Crook. After receiving permission from Goodner, Detective Peterson searched the car. In the back seat near the "trunk area," Detective Peterson found a blue bandana. Also in the vehicle were several photographic identifications of Crook and a temporary registration plate. Detective Peterson said that the Mustang matched the vehicle on the Target security video. He stated that the video revealed that the car had dropped someone off in a "distant part of the parking lot" and that person later ran back to the area where the car was located.

Metropolitan Officer Jimmy Gregg testified that on October 31, 2009, he was "asked to respond to a dark Mustang on Murfreesboro Road." Officer Gregg got behind the vehicle and activated his emergency lights. The vehicle drove into the parking lot of a coin laundry. Officer Gregg activated a spotlight and directed it toward the back window of the Mustang. He said, "I could see a male in the back behind the passenger seat taking off a -- bandanna around from his . . . nose and face area." Officer Gregg said that the bandanna was blue. He identified the [petitioner] as the man who was wearing the bandanna. Officer Gregg recalled that the driver of the Mustang was a female named Jasmine Crook.

Detective Gregory Jennings testified that on October 31, 2009, he was informed that the [petitioner] had been arrested. Detective Jennings responded to the laundromat on Murfreesboro Road, looked in the car, and saw a blue bandanna in the backseat. Detective Jennings read the [petitioner] his Miranda rights, but the [petitioner] did not give a statement.

In his defense, the [petitioner] submitted "certified copies of [three additional theft] convictions of Ms. Cunningham" to impeach her credibility as a witness. The [petitioner] presented no witnesses.

Id. at *1-4.

The petitioner filed a *pro se* petition for post-conviction relief, and following the appointment of counsel, an amended petition was filed on June 3, 2014. In his petitions,

6

the petitioner raised, among other things, numerous allegations of ineffective assistance of counsel.

At the July 18, 2014 evidentiary hearing, Shawndraka Goodner recalled that she testified at the petitioner's trial and that she had "a lot" of charges pending at that time. She said her charges were similar to the petitioner's and involved purse snatching incidents at the Walmart on Dickerson Pike, the Walmart on Hamilton Church Road, and the Target on Cane Ridge Road. Ms. Goodner recalled that the Target incident involved an African-American man snatching a purse from a woman in the parking lot and said that the man charged in that incident was not the petitioner. She also recalled another purse snatching incident that occurred at the Walmart on Nolensville Road, for which she was charged with robbery. Ms. Goodner agreed that five of the incidents "that occurred in the same month as [the petitioner's] charge were very similar to the charges [she] faced at the time [the petitioner] was on trial." She acknowledged that the investigating detectives came to her house and talked to her "because the car was registered in [her] name."

On cross-examination, Ms. Goodner acknowledged that she was dressed in a yellow, prison jumpsuit when she testified at the petitioner's trial. She said that she testified truthfully at the petitioner's trial and that the petitioner was involved in several robberies in addition to the stabbing at Target. One of the robbery incidents involved the petitioner's pushing down an elderly woman and stealing her purse.

The petitioner testified that he was currently incarcerated at Riverbend Maximum Security Institution in the mental health program. He said that he had been prescribed Celexa, Respinol, and Cyogenic and that he had taken those medications before coming to the evidentiary hearing. The petitioner said he had attempted to commit suicide "several times" while incarcerated, as well as prior to his incarceration. The petitioner said that the results of his mental health evaluation showed that he was competent to stand trial. According to the petitioner, trial counsel "should have really looked into" his mental health status and sought an independent expert to evaluate him. The petitioner said that he had been receiving mental health treatment since the age of seven.

The petitioner said that trial counsel represented him at his preliminary hearing and throughout the rest of his case. He and counsel tried to discuss possible defenses, but the petitioner "wasn't on [his] medicine, . . . was cutting [him]self, playing with feces." He could not recall the exact number of times he met with trial counsel but said he talked to her "a few times." Trial counsel relayed the State's plea offers to the petitioner, but he told counsel he was "not going to cop out to it because [he] didn't stab that lady." The petitioner acknowledged that he did not give trial counsel the names of any people to investigate or possible alternate theories because he did not want to involve his family.

7

However, he recalled that trial counsel "had somebody investigate something." He said he did not testify at trial because counsel advised him not to do so.

The petitioner acknowledged that he knew Ms. Goodner and Ms. Cunningham were going to testify at his trial. Asked if he had felt prepared for trial, the petitioner responded, "No, I felt like [trial counsel] wasn't helping me. I don't feel like . . . she did in no type of way." The petitioner claimed that trial counsel should have objected to the victim's rain jacket being admitted into evidence as a violation of chain of custody and as prosecutorial misconduct. He further claimed that counsel should have objected to Ms. Gregory's identification of him.

The petitioner said that because of trial counsel's failure to include a transcript of his sentencing hearing on direct appeal, review of his thirty-seven-year sentence at 100% was waived. Asked if he knew he was going to have a sentencing hearing, the petitioner responded, "I didn't know nothing about none of this." He then clarified that he knew about the hearing but did not know what it was. The petitioner said that his mother and sister were present at the sentencing hearing, but only his mother was called to testify.

On cross-examination, the petitioner acknowledged that he spoke with trial counsel "a good bit" during the course of his case and that they discussed the risks of going to trial versus "pleading out and everything in between." He said trial counsel conveyed the State's plea offers to him, but he rejected all of them. He agreed that it was his decision not to testify at trial. The petitioner acknowledged that trial counsel introduced copies of Ms. Goodner's prior convictions as evidence and cross-examined her. On redirect, when asked if he thought the jury would have benefitted from hearing about Ms. Goodner's pending charges, the petitioner responded, "If I'm not mistaken, the jury did hear those charges."

Trial counsel testified that she began practicing law in Tennessee in 2009 and was appointed to represent the petitioner on several felony charges in general sessions court. The charges were bound over, and the petitioner faced nine felonies in criminal court. Counsel filed a successful motion to sever the charges into three separate trials. Two of the cases went to trial, and the petitioner entered a plea agreement on the remaining charges. Trial counsel met with the petitioner "many times" to discuss the charges he was facing, the ranges of punishment, and possible sentencing. Counsel recalled filing motions in limine concerning the petitioner's identification and prior bad acts. She "[a]bsolutely" reviewed the discovery with the petitioner. Counsel said that she cross-examined the State's witnesses and that Ms. Goodner was untruthful about her prior record. Counsel said she was able to impeach Ms. Goodner by introducing her prior record at trial.

8

On cross-examination, trial counsel said that she had a mental evaluation performed on the petitioner "[v]ery early on" in the case and that the results indicated that the petitioner was "faking." She said that the petitioner "never seemed like he didn't know what was going on, like he didn't know what [counsel] was there for . . . . He always seemed like he was with it[.]" Counsel said she did not believe an objection to the chain of custody of the victim's rain jacket would have been successful or made a difference in the outcome of the petitioner's trial. She said that the victim was "an extremely sympathetic witness" and had friends who were "very sympathetic and honest and trustworthy people that the jury believed."

Trial counsel said that she did not question Ms. Goodner about her pending charges because they were not convictions at the time of trial. Asked if she thought questioning Ms. Goodner about pending charges with a "similar MO" would have been important for the jury to know, trial counsel responded, "I don't know that I could argue with a straight face that [the petitioner] or Ms. Goodner were the only people in Nashville snatching purses. I mean, I've run across a lot of people that do that." Counsel did not recall why the sentencing hearing transcript was not included in the record on appeal although she acknowledged that she normally included such a transcript when handling a direct appeal.

On redirect examination, trial counsel said that the petitioner frequently gave her different stories when they discussed the allegations against him. She said that every time she talked to the petitioner, "[I]t was a different set of facts or a different story. . . . It was very difficult for [counsel] to sort out truth from fiction."

At the conclusion of the hearing, the post-conviction court noted, after consulting with the court clerk, that trial counsel's designation of record included the transcript from the petitioner's sentencing hearing. The court was unsure if the transcript's omission was "clerk error or what." The post-conviction court then took the matter under advisement and subsequently entered an order on August 1, 2014, denying the petition for post-conviction relief.

## ANALYSIS

On appeal, the petitioner argues that counsel was ineffective for failing to (1) question Ms. Goodner about her pending charges for nearly identical offenses, (2) fully question Ms. Goodner about her lack of honesty with detectives when initially questioned, (3) include a copy of the sentencing hearing transcript in the appellate record, and (4) object to the admission of the victim's raincoat. The State counters that the petitioner has waived the ineffective counsel claim regarding admission of the victim's

raincoat because he raised it as an allegation of trial court error, and the post-conviction court treated it as such.

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is de novo, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's

unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

In denying the petition, the post-conviction court concluded:

The petitioner alleges in his amended petition that his conviction was based upon the ineffective assistance of counsel. He specifically alleges that trial counsel failed to investigate the case to the extent that the possibility of an alternative theory of the case was obvious and apparent. The Court finds that trial counsel thoroughly prepared for trial and representation by repeatedly meeting with the petitioner to discuss the case and the many hours of work that she indicated. The Court finds the petitioner has failed to prove this allegation by clear and convincing evidence. The issue is dismissed.

The petitioner also alleges trial counsel was ineffective in failing to fully question Ms. Goodner about her lack of honesty with detectives and her pending charges, and failing to cross examine Detective Peterson about Ms. Goodner's credibility. As to these issues, the Court finds that trial counsel sufficiently cross-examined Ms. Goodner and put her credibility at issue. The Court notes that the petitioner was involved in other robberies with Ms. Goodner, which could have come out before the jury had trial counsel opened the door. A copy of Ms. Goodner's record was also introduced into evidence. The Court finds the petitioner has failed to prove this allegation by clear and convincing evidence. The issue is dismissed.

. . . .

The petitioner also says trial counsel was ineffective in failing to include a copy of the sentencing hearing transcript on appeal. The appellate court did not rule on the issue of sentencing because the record was not complete.[1] The Court determined its sentence after the sentencing hearing

---

[1]The Court notes that trial counsel's "Notice of Designation of Record," filed May 27, 2011, designates for the Record on Appeal that the "Transcript of the Sentencing Hearing on April 28, 2011" be included.

and reaffirms its decision. Even if failing to include the transcript was deficient performance, the Court finds no basis that it, or any other court, would change the sentence. The Court finds no error and the petitioner failed to prove this allegation by clear and convincing evidence. The issue is dismissed.

. . . .

The petitioner also says that there was illegal evidence. Specifically, he alleges that the victim's raincoat and jacket were picked up by the victim before trial from the property room and cleaned and repaired. The State used the raincoat and jacket at trial and viewed by the jury, but was not made an exhibit. The petitioner has failed to prove this allegation by clear and convincing evidence. The issue is dismissed.

. . . .

The Court finds that the petitioner's issues are without merit, the petitioner has failed to meet his burden by clear and convincing evidence, and has not demonstrated any prejudice. Therefore, the petition for post-conviction relief is hereby *denied*.

Trial counsel testified that she was able to impeach Ms. Goodner by introducing her prior record and that she did not question Ms. Goodner regarding her pending charges because they were not convictions at the time of trial. The post-conviction court determined that trial counsel sufficiently cross-examined Ms. Goodner and "put her credibility at issue." Further, as the post-conviction court noted, the petitioner was involved in other robberies with Ms. Goodner, which could have come out before the jury had trial counsel opened the door.

As to trial counsel's failure to include the transcript of the sentencing hearing in the appellate record, the post-conviction court noted at the evidentiary hearing that counsel's designation of the record included the sentencing hearing transcript. The court was unsure if the transcript's omission was "clerk error or what." Further, in its order denying the petition, the post-conviction court found "no basis that it, or any other court, would change the [petitioner's] sentence." The record supports the court's determination as to this issue. Trial counsel designated the transcript of the sentencing hearing to be included in the record on appeal. Although the petitioner has complained of its absence, a copy of the transcript is not in the record for this appeal, and we may not speculate as to whether it would have benefitted the petitioner. Accordingly, this claim is without merit.

12

As to the petitioner's claim regarding trial counsel's failure to object to the admission of the victim's raincoat, trial testimony was that, prior to the trial, the victim had been allowed to regain possession of the coat she had been wearing when the petitioner stabbed her. The coat was repaired and, then, exhibited to the jury during the subsequent trial. In his post-conviction petition, the petitioner objected to this coat's having been returned to the victim. During his testimony at the evidentiary hearing, the petitioner testified that the victim's being allowed to testify about the coat meant that he did not have a "fair trial," that he was "prejudiced," and that he "was denied [his] 14th amendment rights, [his] 6th amendment rights." Further, he claimed that the trial court abused its discretion in allowing this procedure. Following the hearing, in its order, the post-conviction court, apparently to the extent that the court understood the complaint, determined that the petitioner had failed to prove this claim by "clear and convincing evidence."

The State's proof at trial was that the victim's eight-inch deep stab wound had lacerated her kidney. The petitioner has not advanced an explanation as to how his defense was hampered by the pretrial repair of the damage to the victim's coat as he stabbed her. The record supports the post-conviction court's determination that this claim is without merit.

In sum, the petitioner has failed to show that trial counsel was deficient in her representation. We conclude, therefore, that the petitioner is not entitled to post-conviction relief on the basis of his claim of ineffective assistance of counsel.

## <u>CONCLUSION</u>

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
ALAN E. GLENN, JUDGE

13